IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDDIE RIVERA-PABON,

             Defendant.

CRIMINAL CASE NO.

1:09-CR-0395-JOF-JFK

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court is Defendant Eddie Rivera-Pabon's motion [Doc. 23] to suppress evidence obtained during a warrantless search of 215 Park Meadows Drive, Lawrenceville, Georgia, on August 21, 2009, and statements made that same date after Defendant was detained fleeing from the residence and made subsequently in connection with court proceedings. [Doc. 23]. An evidentiary hearing was held on the motion to suppress on March 10, 2010, and May 21, 2010.[1] [Docs. 35 and 37]. No longer an issue before the court is the admissibility of Defendant's statements concerning the ownership of the contents of a safe found in the residence made on August 21, 2010, or the statements concerning the same topic made on a financial

---

[1]Citations to the transcript of the March hearing are: (Tr. at ). And citations to the May hearing are: (May Tr. at ).

affidavit submitted in connection with a request for court appointed counsel during preliminary court proceedings.  The Government has advised the court and Defendant that the Government will not use either statement in its case-in-chief against Defendant.  [Doc. 41 at 10 n.8; Tr. at 4].  Defendant's motion to suppress those statements should be denied as moot.

As to the search of the residence, the Government contended and continues to do so that Defendant cannot challenge the search because he does not have a legitimate expectation of privacy in the residence located on Park Meadows Drive.  [Doc. 41 at 11-16; Tr. at 5].  The Government also contends that Defendant does not have a legitimate expectation of privacy as to any of the vehicles parked at the residence. [Doc. 41 at 21].  Defendant asserts that he does have a legitimate expectation of privacy in the residence to allow him to challenge the warrantless search.  [Doc. 38 at 11-15].  Defendant did not address in his post-hearing brief the search of the vehicles apparently abandoning any challenge to the search of the vehicles.  [Doc. 38].

In the alternative, the Government argues that, if Defendant can challenge the search of the residence, the warrantless entry was based on exigent circumstances, specifically the exception for an emergency/care-taking function as set forth in United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002); therefore, all of the evidence

2

observed in plain view during the protective sweep is admissible at trial.  [Doc. 41 at 17-20].  The Government concedes that certain items of evidence, such as quantities of cocaine and currency, found during a subsequent warrantless search of the residence, are not admissible.  [Doc. 41 at 20-21].  Defendant contends that the exigent circumstances exception to the warrant requirement does not apply in this case because the Government created the circumstances giving rise to the exigency and because the Government had the intent to enter the residence in any event.  [Doc. 38 at 16-18].

## I.    Facts[2]

The Drug Enforcement Administration ("DEA"), specifically Task Force Officer ("TFO") Ronald Skipper,[3] received information in February 2009 from a cooperating defendant identifying the residence located at 215 Park Meadows Drive,

---

[2]Defendant offers a list of items that he contends establishes the lack of credibility of the agents and officers testifying at the hearing.  [Doc. 38 at 9-11].  The court has considered the testimony presented at the hearing and Defendant's claims regarding credibility.  The court finds that the testimony of the witnesses at the hearing was credible and accurate and that the discrepancies in the testimonies were not material to the determination of the issues before the court.  The court's statement of the facts takes into account the differing perceptions of the witnesses of the events to the extent necessary in resolving the issues.

[3]TFO Skipper, who has been a law enforcement officer for twenty-six years, works for the Georgia Department of Corrections as a fugitive agent and has been detailed to the DEA for eleven years.  (Tr. at 247).

Lawrenceville, Georgia, as a "cut" house[4] operated by a "Dominican" by the name of "Rafaelito" and usually occupied by a "Dominican" named "Kiko."  (Tr. at 9, 41-42, 247-49).  TFO Skipper testified that he was aware that this organization always has weapons present and that Kiko had been robbed at the residence at gun-point.  (Tr. at 249).  Based on this information, agents and TFOs began sporadic surveillance of the residence.  (Tr. at 9, 42).

During that surveillance, TFO Patrick Skinner, an agent with the Georgia Bureau of Investigation ("GBI") assigned to the DEA, and TFO Kevin Krueger, an officer with the DeKalb County Police Department assigned to the DEA, consistently observed two vehicles parked at the residence, a burgundy Explorer and a gold Explorer, but neither observed any individuals outside the residence or other activity at the residence.[5]  (Tr. at 9-10, 42-43).  The only light observed on at the residence was the front porch light which remained turned on day and night.  (Tr. at 11).  The

---

[4]A "cut" house is a location where quantities of controlled substances are diluted, by the addition of chemicals, and then re-packaged for distribution.  (Tr. at 9).  Such locations, also known as "stash" houses, characteristically have blocked windows, infrequent activity until the arrival of controlled substances or currency, and counter-surveillance to detect law enforcement activity.  (Tr. at 8).

[5]No other vehicles were observed at the residence except for a blue BMW on one occasion.  (Tr. at 10, 43).

4

windows of the residence were covered, and the windows on one of the garage doors were blocked.  The second garage door did not have windows.  (Tr. at 16; Gov't Ex. 1).

On August 20, 2009, in the morning, a gray Ford F-150 truck was observed parked at the residence.  For the first time, Defendant Rivera-Pabon was observed as he exited the front door of the residence and walked over to the Ford truck before he went back inside the residence.  (Tr. at 11-12, 43, 53).  Shortly thereafter, a U-Haul arrived at the residence and backed up to one of the garage doors and two men exited.  (Tr. at 13-14, 43-44, 56; Gov't Ex. 1).  All that the surveillance officers could observe was furniture unloaded off the back of the U-Haul and then, after a short period of time, the furniture being reloaded.  Defendant could not be identified as participating in this activity.  (Tr. at 44, 53-55).  The U-Haul departed traveling to a second residence.  (Tr. at 15).  Based on the activity at the residence on August 20, additional surveillance was conducted on August 21, 2009.  (Tr. at 15, 46, 57).

When the surveillance began on August 21, the Ford truck was parked in the same location in front of the garage doors.  (Tr. at 15).  At about 9:17 a.m., the burgundy Explorer arrived, and a Hispanic male exited the vehicle.  (Tr. at 15-16).  He climbed over the back fence but soon returned to stand on the driveway for a few

5

minutes before re-entering the Explorer and leaving.[6] He was observed using a cellular telephone as he drove off.  (Tr. at 16-18).  The Explorer returned in a few minutes parking in front of the Ford truck, and at about 10:21 a.m., a Mercedes arrived at the residence parking in front of the other garage door.  (Tr. at 18, 26).  Defendant exited the passenger side of the Mercedes, carrying a black trash bag, and apparently entered the front door of the residence with the driver of the Explorer following Defendant. (Tr. at 18-19, 25-26).  The Mercedes left.  (Tr. at 19, 58).  A short while later, at approximately 10:29 a.m., Defendant entered the Explorer, on the passenger side, no longer carrying the trash bag, and the same Hispanic male entered the Explorer as the driver.  The Explorer left the residence.  (Tr. at 19, 27-29, 58).

Surveillance followed the Explorer to a Family Dollar store, where small purchases were made, and then to two Shell gas stations, where no gas nor anything else was purchased, and then to the Space Saver Storage Unit.  (Tr. at 19-20, 47-48, 58-59).  Although surveillance could observe the Explorer backed up to the open door of a unit and Defendant outside of the Explorer, no details of what was occurring were observed.  (Tr. at 48, 51-52).  The Explorer was followed back to the Park Meadows

---

[6]TFO Skinner assumed no one was in the residence given the actions of the driver of the Explorer.  (Tr. at 39).

Drive residence, where surveillance observed it going into the garage with the door closing blocking the view of surveillance officers at about 11:00 a.m. (Tr. at 29, 61, 93). Other vehicles arrived at the residence, the occupants exiting to enter the residence for a short time before exiting the residence and re-entering the vehicles and leaving. (Tr. at 30-31, 62, 94-96). One of those vehicles, a gold Jeep returned again at 1:15 p.m., and the driver entered the residence. (Tr. at 62, 96). Based on the surveillance as of that time, the agents and officers on scene believed that three individuals were inside the residence, that is, Defendant and the driver of the Explorer and the driver of the Jeep. (Tr. at 63, 96, 98; May Tr. 50).

Based on the information available, the decision was made to conduct a knock and talk at the residence to attempt to speak with the occupants and to obtain permission to enter the residence.[7] (Tr. at 64, 117, 137, 252; May Tr. at 14-15). If no one answered the knock on the door or allowed the agents and officers permission to

---

[7]The DEA Group Supervisor on scene, Everett Tolbert, testified that the primary concern in conducting a knock and talk is safety; therefore, the agents and officers approaching the residence make sure that the occupants know they are law enforcement. When the residence being approached is believed to be a "stash" house, as was true with the Park Meadows Drive location, given the potential for home invasions and robberies, there is a concern that there could be gun fire. (Tr. at 116-17, 139, 186). Another concern is to cover the perimeter of the residence to prevent occupants from fleeing. (Tr. at 116).

enter, then, absent exigent circumstances, the agents and officers would have not entered the residence and would have left.  (Tr. at 140-41, 202; May Tr. at 14-15). According to TFO Skipper, the agents and officers lacked probable cause to obtain a search warrant for the residence, and there was no opportunity, based on the information known to the surveillance agents and officers, to conduct a stop and detention of one of the vehicles traveling to or from the residence.  (Tr. at 250-52). Around 2:00 p.m., four law enforcement officers approached the front door of the residence.  Agent Tolbert and TFO Miguel Henao, an officer with the Doraville Police Department assigned to DEA and a native Spanish speaker, were at the top of the porch steps at the front door, and TFO Skipper and a uniformed police officer who had arrived in his marked patrol vehicle were standing at the bottom of the steps.  (Tr. at 99, 118-19, 139, 252; May Tr. at 4-6, 15).  Agent Tolbert and the TFOs were all attired in casual clothes but each was wearing a bullet-proof vest marked on the front and back with "POLICE."  And the agent and TFOs had weapons which were holstered. (Tr. at 118, 120; May Tr. at 6).  Other agents and TFOs were in the area, either in their vehicles or standing at the right side or right rear of the residence.  (Tr. at 64, 110, 118, 122, 139-40, 169, 191, 220, 253; Gov't Exs. 3, 4).  DEA Agent Edward Henning, who was moving around on the right side of the residence, had the responsibility of having

8

entry tools available, which were in his vehicle, to use if necessary due to circumstances encountered during the knock and talk. (Tr. at 122, 141, 169).

TFO Henao knocked on the front door, loud enough to be heard, several times and announced police in Spanish as Agent Tolbert announced police in English. (Tr. at 120-21; May Tr. at 6, 16-17). No one answered the door. (Tr. at 121; May Tr. at 6, 17). The agents and officers at the front door saw someone looking out of the blinds of a window slightly higher than the door and to the left and then heard the sound of footsteps running in the residence. (Tr. at 121-22, 253-54; May Tr. at 6, 17; Gov't Ex. 2). During this time, the agent and officers at the front door began hearing yelling and noise from the backyard but were not sure what was happening.[8] (Tr. at 252, 290; May

---

[8]One of the DEA agents at the back of the residence, Lavel Kinney, had climbed on the top of a gas meter to look over the wood fence running along this section of the fenced back yard in anticipation of climbing over the fence and entering the backyard. (Tr. at 171, 220, 230). As he looked over the fence, a pit bulldog rushed the fence barking. The agent saw a Hispanic male exit a back door of the residence, so the agent called to him to get the dog. The agent also called out that there was a dog and man in the backyard. (Tr. at 191, 195, 220-21, 230-32). The male ignored the request and started towards the back of the yard. (Tr. at 221, 234). Agent Kinney yelled at the other agent, DEA Agent Eshmon, who was outside the backyard fence that the Hispanic male was about to run. (Tr. at 222). Agent Kinney could not hear what was happening in the front of the residence. (Tr. at 238). The agent saw a second Hispanic male, later identified as Defendant, also exit the residence and start walking towards the fence. (Tr. at 222, 228, 234). And Agents Kinney and Eshmon chased the first Hispanic male as he jumped over the back fence and started running through the woods. (Tr. at 223-25, 239-40).

Tr. at 7).  Agent Tolbert directed TFO Skipper to be sure that both sides of the residence were covered, and TFO Skipper left the front of the residence and went around to the left side of the backyard while Agent Tolbert and TFO Henao continued to knock on the front door.  (Tr. at 123, 145, 252).  As these events were transpiring, either because he was directed to secure the entry tools or deciding on his own to be ready in case the entry tools were needed given what was going on inside and outside the residence, Agent Henning had started towards his vehicle which was parked in front of the residence to obtain the entry tools.  And TFO Richard Otwell, an Agent with the GBI and assigned to the DEA, drove up and parked on the street near the residence, exiting his vehicle to walk towards Agent Henning.  (Tr. at 122-23, 143, 172-74, 197-199, 202; May Tr. at 17).

As TFO Skipper got around the part of the backyard fence that was made of wood, he observed a Hispanic male, Defendant Rivera-Pabon, in the backyard, and the officer yelled at Defendant to stop.[9]  (Tr. at 254, 257, 290).  Defendant did not stop but climbed the fence, and TFO Skipper, who had his weapon drawn and held at the low-ready position, gave chase through the undergrowth as best he could.  (Tr. at 257-58,

_____

[9]The fencing at the front sides of the residence was constructed of wood.  The remaining part of the fence enclosing the back yard was chain link.  (Gov't Exs. 3, 4, 6, 8).

10

290, 298-99).  He yelled again at Defendant to stop.  Defendant stopped, threw up his

hands, and responded, "Okay, okay."  (Tr. at 257-58, 290).  The officer directed

Defendant to get on the ground, and Defendant complied.  (Tr. at 258-59m 291).  At

that point, TFO Skipper turned to look behind him, back into yard, to check what was

happening, expecting to see agents and officers, but instead he saw the pit bulldog

running towards him.  He saw the dog as it lunged up and started over a ledge to go

over the fence.  (Tr. at 259-60, 291-93).  The officer decided to shoot the dog but saw

some heads in the background, over the fence at the far right side of the residence, and

tried to stop from firing.  However, the firearm discharged two times into the ground -

chasing the dog back away from the fence.  (Tr. at 260-61, 280, 282).  TFO Skipper

then holstered his firearm and handcuffed Defendant.  (Tr. at 261).

At the front of the residence, Agent Tolbert and TFO Henao, who were still

standing outside the front door, heard the commands to stop and other commotion in

the backyard.  (Tr. at 123, 150; May Tr. at 7).  They then heard the two shots.  Neither

they nor the other agents at the front of the residence had any idea why the shots were

fired or who fired the shots, but the agents and officers generally believed that the

11

shots were fired from the outside, rear of the residence.[10] (Tr. at 123-24, 145, 147, 149, 175-76, 210-11; May Tr. at 7-8, 30, 33).  Agent Tolbert and TFO Henning decided to enter the residence because they did not know what was happening and who might have been shot and because of concern for the safety of the occupants and law enforcement.[11]  (Tr. at 123, 146-48, 177, 207).  After kicking the door several times and breaking it open, Agent Tolbert, TFO Henao and the uniformed officer, who had by then been joined by Agent Henning,[12] entered the residence with their weapons drawn to conduct a protective sweep.  (Tr. at 124-25, 172, 176, 207-08; May Tr. at 8, 29, 33).  As the agents and officers entered the residence, which was a split level, all but the uniformed officer headed upstairs.  The uniformed officer was directed to remain just inside the door on the landing and to watch the stairs leading to the basement.  (Tr. at 65, 125, 177, 208-09; May Tr. at 8, 46).  During the sweep of the

_____

[10]None of the agents or officers were in radio communication while on foot outside of their vehicles.  (Tr. at 65, 124, 261).

[11]Agent Tolbert stated that based on hearing the commands to stop, he believed individuals were fleeing the residence when the shots were fired.  (Tr. at 150).

[12]As Agent Henning had reached his vehicle, he heard the two gun shots.  He decided not to obtain the entry tools but to join the others at the front door, and he made entry with them.  (Tr. at 171-72, 175-76, 200).

AO 72A
(Rev.8/82)

upstairs, Agents Tolbert and Henning and TFO Henao did not find any individuals and did not observe any drugs, weapons or currency.  (Tr. at 125-26, 177; May Tr. at 8).

TFO Otwell, who had just exited his vehicle to walk towards Agent Henning, heard the two gun shots from the rear of the residence.  (Tr. at 64-65, 101).  He got his vest and ran to the front door arriving after the other four men had already entered and headed upstairs.  (Tr. at 65, 102).  He saw the uniformed officer standing on the landing and went downstairs to clear that part of the residence because he had heard the shots and did not know what had happened.  (Tr. at 65-66, 66, 103-05, 108).  When he reached the bottom of the stairs, TFO Otwell went to an open door towards the rear of the basement to see if anyone was inside.  (Tr. at 68; Gov't Ex. 33).  He observed that the back door to the backyard was partially open and that there was another doorway at the rear of the room, which he walked to and looked inside.  This was a bathroom.  (Tr. at 68, 110-11).  He did not see anyone.  (Tr. at 68, 110).  However, as he walked through the room, he observed bags of white powder sitting on the floor, a kilo-press on a table, two handguns, a microwave and a hot plate with a container of boiling water and cinnamon sticks.  (Tr. at 68-71).  Along with the odor of cinnamon, he smelled the odor of cocaine.  (Tr. at 71).  In the open basement door, he observed a set of keys, and in open cabinets and shelves, he observed chemicals, a heat sealer

13

and bags, a scale and various other items associated with cutting and packaging cocaine.[13]  (Tr. at 72-75, 106-07).  He did not see any clothing, food or a bed in the room.  (Tr. at 74).  When he completed the sweep of that area, he was advised that the rest of the basement had been cleared, so he left the residence for the time being.[14]  (Tr. at 75-76).  Others had checked the other room in the basement, finding a locked safe in a closet in that room.  (Tr. at 130-31, 178-79).  And agents swept the garage area, in which was located the burgundy Explorer and the gold Explorer.[15]  (Tr. at 179, 304).

By the time the protective sweep was completed, TFO Skipper had arrived at the front of the residence with Defendant, who was taken inside to the living room area.  (Tr. at 262).  TFO Skipper explained to Agent Tolbert that he fired the shots at a dog.  (Tr. at 158, 262).  Taken off of Defendant's person was a driver's license in his name, issued in February 2009, with the address of 1435 Boggs Road, Apt. 2903, Duluth,

---

[13]The items that TFO Otwell observed during the protective sweep are listed on Gov't Ex. 29 as drug evidence items 3, 4, 5, 6, 7, 8, and 9 and as non-drug evidence items 4, 5 (except for a firearm magazine located in a kitchen drawer), 7, 9, 13, 19, 21, and 25.  See also Gov't Exs. 18-25.

[14]Agent Tolbert and TFO Skipper also confirmed observing the items noted by TFO Otwell during the protective sweep.  (Tr. at 128-30, 158, 263, 265, 306-08).

[15]Still parked on the driveway were the Ford F-150 truck and the gold Jeep.  (Tr. at 305).

14

Georgia 30096.  (Tr. at 264, 305; Gov't Ex. 15).[16]   While obtaining booking information, such as name, date of birth, and address, TFO Henao asked Defendant if the address on the driver's license was correct.  Defendant responded, yes.  (Tr. at 11-12).  TFO Skipper determined that none of the vehicles at the residence were registered to Defendant; none were registered in the name Angel Rivera-Pabon.[17]  (Tr. at 267-68).  Also, the agents and officers testified that the residence had little to no furniture or clothing.  Besides maybe a blow-up mattress in one of the bedrooms, only the front room in the basement had a bed.  (Tr. at 79, 131-32; May Tr. at 48-49).  As TFO Skipper testified, there was no indication "someone was actually living there."  (May Tr. at 49).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.    Discussion

### a.    Expectation of Privacy

---

[16]This item is identified on Gov't Ex. 29 as non-drug item 12.

[17]The items found in the one or more of the four vehicles are identified on Gov't Ex. 29 as non-drug evidence numbers 1, 2, 3, 6, 18, 20, 22, 23, and 24.

AO 72A
(Rev.8/82)

The preliminary issue to be resolved is whether Defendant had a legitimate expectation of privacy in the residence located at 215 Park Meadows Drive or in the vehicles found at that location.  After a consideration of the facts presented at the evidentiary hearing, the court finds that Defendant did not have an expectation of privacy in either the residence or the vehicles[18] that society is willing to recognize as legitimate.

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested a 'subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate."  Id. (citation omitted).  In this

---

[18]Although Defendant did not address the search of the vehicles in his post-hearing brief [Doc. 38], thus appearing to abandon any challenge to the search of the vehicles, the court has addressed the testimony and relevant case law regarding the search of the vehicles.

AO 72A
(Rev.8/82)

regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 425, 58 L. Ed. 2d 387 (1978)). Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). A claim that an individual has an interest in the items seized during a search, however, is insufficient to establish his or her Fourth Amendment rights were implicated by a search. Id.

In Cooper, the Eleventh Circuit Court of Appeals stated:

The Supreme Court long has recognized that the Fourth Amendment's guarantee of freedom from warrantless searches and seizures is not premised on arcane concepts of property and possessory interests; instead, the Fourth Amendment protects an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion. . . .

Id. at 1283-84 (citations omitted); see also United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994). Ownership, while a factor to be considered, is not dispositive of this

17

issue.  See Chaves, 169 F.3d at 690; Ramos, 12 F.3d at 1023.  "[E]ven where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." Chaves, 169 F.3d at 690.  For example, the Supreme Court has held that a person, such as an overnight guest in a house of a third party, has a reasonable expectation of privacy. Minnesota v. Olson, 495 U.S. 91, 96-100, 110 S. Ct. 1684, 1687-90, 109 L. Ed. 2d 85 (1990).  However, as the Court has affirmed, not everyone "who is merely present with the consent of the householder" may necessarily be able to challenge a search of the premises. Minnesota v. Carter, 525 U.S. 83, 90, 119 S. Ct. 469, 473, 142 L. Ed. 2d 373 (1998) (citing Rakas, 439 U.S. 128, 99 S. Ct. 421).  In Carter, the Supreme Court in fact declined to find that a visitor to a residence, present for only a short period of time and for the purpose of conducting illicit drug transactions, without any known prior connection to the residence, had a reasonable expectation of privacy to contest a search of the residence. Id. at 90-91, 119 S. Ct. at 473-74.

Applying this legal framework to the facts established by Defendant at the evidentiary hearing indicates that at best he was only a short-time visitor to the residence, without any known connection to the home owner or lease holder or the

18

residence itself, and was present purely for the purpose of engaging in illicit drug trafficking activities.   Defendant did not present any evidence concerning his relationship with the home owner or lease holder.[19]  He did not present any evidence establishing that he was present at the residence at any time other than August 20 and August 21, 2009 – nor that he spent the night between the two days that he was observed at the residence.[20]  And given the use of the location, as a stash or cut house,[21] even if Defendant had been present overnight, he would not have established a legitimate expectation of privacy in the residence.   See United States v. Jimenez, 336 Fed. Appx. 798, 802 (10th Cir. July 7, 2009) ("Defendant cannot challenge [the

---

[19]The only evidence in the record concerning ownership or occupancy of the residence was offered by TFO Skipper, who testified that a cooperating defendant had advised that the residence located at 215 Park Meadows Drive, Lawrenceville, Georgia, was a "cut" house operated by a "Dominican" by the name of "Rafaelito" and usually occupied by a "Dominican" named "Kiko."  (Tr. at 9, 41-42, 247-49).

[20]Again, government witnesses presented the only evidence on this point stating that during the months of surveillance leading up to and including August 20 and 21, 2009, Defendant was first observed at the location on August 20. (Tr. at 12, 43). And when he was seen on August 21, the reasonable inference from the facts presented at the hearing, that is, that no one was apparently inside when the burgundy Explorer arrived and that Defendant subsequently was dropped off (Tr. at 15-18, 25-26, 39), establishes that Defendant was not present overnight – nor was anyone else.

[21]The undisputed facts established that 215 Park Meadows was utilized as a stash or cut house for drugs.  (Tr. at 8-9, 42, 68-75, 128-30, 186, 248-49).

protective sweep of the residence] because he had no reasonable expectation that his presence at the residence – solely for the purpose of illicit drug trafficking activity – would remain private."); United States v. Bell, 218 Fed. Appx. 885, 895 (11th Cir. 2007) (rejecting the defendant's claim that, because he was an overnight guest in the location which he admittedly used solely for his drug operation, he could challenge a search of the apartment, the court stated that "to establish a reasonable expectation of privacy, however, Bruce Bell would have to prove that he was a guest for personal reasons, not for a commercial purpose"); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1342-43 (N.D. Ga. 2009) ("Absent evidence of an identifiable host who granted them permission to stay at the residence, defendants have not demonstrated that they were 'guests.'  The mere fact that they may have slept in the house, had some belongings and paperwork there, sometimes ate meals at the house and cooked in the kitchen, watched TV and played pool in the house . . . does not establish that they were overnight guests[,]" and even if this evidence established that they were overnight guests, because the residence "was being used 'primarily for commercial' purposes, . . . the defendants had no reasonable expectation of privacy. . . .").

20

In fact, the very obvious use of the residence, as a location facilitating an illicit drug operation, with scant indications that anyone lived in the premises,[22] negates any reasonable expectation of privacy in the location.  See United States v. Gray, 491 F.3d 138, 146-47 (4th Cir. 2007) (noting that "those who venture forth to conduct illegal business often do not hold a legitimate expectation of privacy in locations that are not their own[,]" the court found that the "facts of this case suggest that Askew was a business, not a social, guest" in another's home using the premises, for which he did not have a key, had been present for only a short time, was only one of several visitors, and was not planning to spend the night but to sell drugs); United States v. Renteria, 2 Fed. Appx. 855, 856 (9th Cir. 2001) ("A defendant who uses an apartment for a few hours to package cocaine and demonstrates no personal connection to the residence does not have a legitimate expectation of privacy there."); Rodriguez-Alejandro, 664 F. Supp. 2d at 1343 (even if the evidence established that the defendants were overnight guests in the residence used as a stash house, because the residence "was being used 'primarily for commercial' purposes, . . . the defendants had no reasonable

---

[22]The agents and officers testified that the residence had little to no furniture or clothing.  Besides maybe a blow-up mattress in one of the bedrooms, only the front room in the basement had a bed.  (Tr. at 79, 131-32; May Tr. at 48-49).  As TFO Skipper testified, there was no indication "someone was actually living there."  (May Tr. at 49).

expectation of privacy"); United States v. Holland, 985 F. Supp. 587, 601 & n.16 (D. Md. 1997) (although the court held that the defendant could not rely on the government's theory of the case, that is, that the residence searched was the defendant's stash house, to establish a legitimate expectation of privacy, the court noted that even if that location was the defendant's stash house and frequently visited by him, he still had not established that he had a legitimate expectation of privacy in the residence).

Except for the fact that Defendant was observed entering the residence and subsequently fleeing from the residence, he presented no evidence of his authority to be in the premises or his relationship with the premises.  Defendant presented no evidence that the keys found in the open back door to the residence belonged to him and not to the other occupant fleeing the residence or even to someone else not present at the time.[23]  Defendant presented no evidence that he had personal belongings, such as, clothing, toiletries or related items, in the residence.  The fact that Defendant

_____

[23]Defendant notes that the keys found in the back door included keys to the storage unit he visited earlier in the day.  [Doc. 38 at 14].  However, the court is not sure what inference can be drawn from that fact given the lack of any claim by Defendant that the keys were his and not simply in the residence for use as needed by visitors.  And Defendant was not the first to flee the residence indicating that the door was unlocked using those keys by someone other than Defendant.  (Tr. at 221-22, 226-28, 257-58).

AO 72A
(Rev.8/82)

claimed ownership over the contents of the locked safe, that is, $57,180 in currency, does not support his argument.  [Doc. 38 at 13].  Given the nature of the use of the location, a stash house, the reasonable inference drawn from the presence of those funds is use in the illicit commercial enterprise and not as Defendant's personal legitimately obtained funds.  The currency was contraband just the same as the drugs, packaging, and other items associated with drug dealing found in the residence. Defendant's claim over contraband stored in the residence does not establish a legitimate expectation of privacy in the residence.  Chaves, 169 F.3d 690 (a claim that an individual has an interest in the items seized during a search, however, is insufficient to establish his Fourth Amendment rights were implicated by a search); United States v. Huerta, 2009 WL 5065694, at **1-2 (E.D. Tenn. December 19, 2009) (finding that the defendant's use of the trailer as a storage bin for his marijuana "did not give him a reasonable expectation of privacy," the court noted that "[s]ociety is not prepared to accept as legitimate an expectation of privacy that is based solely upon the storage of illegal contraband," given a lack of ownership interest in the property).

Defendant did not carry his burden of establishing that he had a legitimate expectation of privacy in the residence located at 215 Park Meadows Drive.  As to the four vehicles located at the residence, Defendant fails to even offer an argument that

23

he can challenge the search of those vehicles.  [Doc. 38].  The only evidence in the record linking him to any one of the vehicles is the fact that he was a one-time passenger in the burgundy Explorer.  (Tr. at 19-20, 27, 29, 46-48).  However, he presented no evidence of ownership or any other interest in the vehicles.  In fact, the evidence before the court indicates that none of the vehicles were registered in Defendant's name.  (Tr. at 267-68).  Defendant, likewise, did not carry his burden that he has a legitimate expectation of privacy in any one of the four vehicles.

For these reasons, Defendant cannot challenge the entry into or search of the residence located at 215 Park Meadows Drive or the vehicles found on the premises, and the court recommends that Defendant's motion to suppress be denied on this ground.  However, if the District Court finds that Defendant did have a legitimate expectation of privacy, as he contends, in the residence, the court recommends that Defendant's motion to suppress be denied as to those items observed in plain view in the basement of the residence during the protective sweep.

**b.     Exigent Circumstances - Entry and Protective Sweep**

Defendant contends that the entry into the residence was not justified by exigent circumstances, but that if any exigency existed, that exigency was created by the law enforcement officers and cannot be relied on to justify the warrantless entry.

Defendant contends that the exigency was created by TFO Skipper firing the shots at the dog which he claimed was charging him from the fenced backyard and that these shots, fired outside the residence, did not establish any exigency to enter the residence. [Doc. 38 at 16-18].  Additionally, Defendant points to evidence which he contends establishes the agents' and officers' intent to enter the residence in support of his claim of lack of exigent circumstances.  [Id.].  As noted, the Government relies on the Eleventh Circuit Court of Appeals decision in Holloway and contends that the circumstances, as known to the agents and officers at the front door to the residence, established an emergency situation permitting the warrantless entry and protective sweep of the residence.  [Doc. 41 at 17-19].

"Since physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  United States v. Gonzalez, 71 F.3d 819, 827 (11th Cir. 1996) (quoting Welsh v. Wisconsin, 466 U.S. 740, 748-49, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984) (internal quotations omitted)).  One exception to the warrant requirement is based upon a finding of exigent circumstances.  In United States v. Santa, 236 F.3d

662 (11th Cir. 2000), the Eleventh Circuit Court of Appeals explained this exception

to the warrant requirement:

> "A warrantless search is allowed, however, where both probable cause
> and exigent circumstances exist.". . .
>
> Although "[c]ourts have catalogued several situations in which exigent
> circumstances exist, . . . it is clear that the exception must be applied
> carefully to each factual scenario.". . . "[T]he general requirement that a
> search warrant be obtained is not lightly to be dispensed with, and 'the
> burden is on those seeking [an] exemption [from the requirement] to
> show the need for it. . . .'" The exigency exception only applies when
> "the inevitable delay incident to obtaining a warrant must give way to an
> urgent need for immediate action.". . .  Recognized situations include:
> "danger of flight or escape; danger of harm to police officers or the
> general public; risk of loss, destruction, removal, or concealment of
> evidence; and 'hot pursuit' of a fleeing suspect."

Santa, 236 F.3d at 668-69 (citations omitted).

Recently, in Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S. Ct. 1943, 164

L. Ed. 2d 650 (2006), the United States Supreme Court addressed the exception as it

applies to a law enforcement officer's community caretaking function, that is, to

address a threat of danger to the occupants of a residence, the police or the public:

> One exigency obviating the requirement of a warrant is the need to assist
> persons who are seriously injured or threatened with such injury. "'The
> need to protect or preserve life or avoid serious injury is justification for
> what would be otherwise illegal absent an exigency or emergency.'". . .
> Accordingly, law enforcement officers may enter a home without a

26

> warrant to render emergency assistance to an injured occupant or to
> protect an occupant from imminent injury.

Id. at 403, 126 S. Ct. at 1947 (citations omitted). The Court further stated that the

"officer's subjective motivation is irrelevant" in determining whether exigent

circumstances exist. Id. at 404, 126 S. Ct. at 1948. "An action is 'reasonable' under

the Fourth Amendment, regardless of the individual officer's state of mind, 'as long

as the circumstances, viewed *objectively*, justify [the] action.'"[24] Id. (citation omitted)

(emphasis in original); United States v. Tennis, 309 Fed. Appx. 312, 314 (11th Cir.

2009) (same). Prior to the decision in Stuart, the Eleventh Circuit Court of Appeals

---

[24]Based on this binding legal authority, therefore, the court declines Defendant's invitation to consider facts, such as the reason TFO Skipper fired the shots or why and when Agent Henning decided to retrieve entry tools, which he contends establishes a subjective intent by the agents and officers to either create exigent circumstances or to enter the residence to conduct a search even absent exigent circumstances. See United States v. Hernandez, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005) (the Eleventh Circuit Court of Appeals rejected a defendant's contention that her consent to search was invalid and that the case should be evaluated as if there was no consent to search at all because the officer had since the incident testified that he would have conducted the search even without consent stating "[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis"); United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003) (rejecting the defendant's claim that his consent was "somehow obtained under false pretenses" because the officers' true motives were not stated, the court stated, "'[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken'") (citation omitted).

AO 72A
(Rev.8/82)

held that included within the situations allowing an exigent entry into a residence was an emergency situation.  In <u>Holloway</u>, the court stated, "One of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation."  290 F.3d at 1335.  The court further stated that "[t]he most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life."  <u>Id.</u>  "The exigent circumstances doctrine applies only when there is a compelling need for official action, but no time for law enforcement to secure a warrant."  <u>Tennis</u>, 309 Fed. Appx. at 313.

In <u>Holloway</u>, the court affirmed that the Government had the burden of proving any exception to the warrant requirement and that the Government must establish both exigency and probable cause for this exception to apply.  <u>Holloway</u>, 290 F.3d at 1337. With respect to an emergency situation, the court explained how the requisite probable cause showing was met:

> In the typical case, probable cause exists where the circumstances would lead a reasonable person to believe a search will disclose evidence of a crime. . . .  In emergencies, however, law enforcement officers are not motivated by an expectation of seizing evidence of a crime.  Rather, the officers are compelled to search by a desire to locate victims and the need to ensure their own safety and that of the public. . . .  Thus, in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger.

28

Id. at 1337-38; see also Tennis, 309 Fed. Appx. at 314 (same).  In this case, the Government does not argue that the facts and circumstances known at the time of the entry into the residence established probable cause to enter the residence to search for evidence of a crime [Doc. 41 at 17-19]; instead the Government relies on the emergency situation confronting the agents and officers at the front door of the residence given the objective facts known to them at that time [Id.].

Those facts did establish an emergency justifying the entry into the residence for the purpose of addressing the potential risk to the safety of and threat to the lives of the occupants believed to be inside and the law enforcement officers in the vicinity of the residence.  Agents Tolbert and Henao, who made the decision to breach the door and to enter the residence, were aware of the following information prior to entry.  The residence was a suspected stash or cut house, which is a location where quantities of controlled substances are diluted, by the addition of chemicals, and then re-packaged for distribution.  (Tr. at 9, 42, 248-49).  Agents approaching such locations to conduct a knock and talk have as a primary concern safety which is addressed, at least in part, by ensuring the occupants are aware they are law enforcement.  Given the potential for home invasions and robberies, there is a concern that there could be gun fire.  (Tr. at 116-17, 139, 186).  In fact, a cooperating defendant had advised that an armed robbery

29

had occurred at this residence, and the investigation of the organization believed to be operating the stash house indicated that firearms were always present. (Tr. at 249). At the time the agents and officers approached the residence, based on earlier surveillance, they believed three individuals were inside. (Tr. at 63, 124, 293).

After knocking on the door and identifying themselves as police several times, no one answered the door, but agents and officers at the front door observed someone looking out a window and then heard running footsteps inside. (Tr. at 119, 121-22, 252-54; May Tr. at 5-7, 16-17). TFO Henao stated, that in his experience, this reaction indicated "something bad is gonna happen." (May Tr. at 18). And Agent Henning stated that it was unusual for no one to answer the door when police knock. (Tr. at 174). As these events were occurring, agents and officers at the front of the residence heard commotion in the backyard of the residence, and Agent Tolbert sent TFO Skipper to the left side of the residence that was not covered by law enforcement. (Tr. at 123, 145, 252-53, 290). Shortly thereafter, Agent Tolbert and TFO Henao heard shouts to stop, and then two gun shots, apparently fired outside of the rear of the residence, were heard by those in front of the residence. (Tr. at 123-24, 145-46, 148, 176, 210-11; May Tr. at 7-8). Agent Tolbert stated that he believed someone was attempting to flee the residence. (Tr. at 150). However, neither Agent Tolbert or TFO

30

Henao – nor any of the other agents or officers in front of the residence – knew why or by whom the two shots were fired.  (Tr. at 123-25, 148, 174-75; May Tr. at 8, 33). Agent Tolbert and TFO Henao, after hesitating for a few seconds, made entry into the residence by kicking in the door.  They did so because of the shouts and the unexplained gun fire from the rear of the residence.  (Tr. at 123-24, 146-48; May Tr. at 8).  The other agents and officers that followed them in immediately, Agent Henning and TFO Otwell, also entered due to the gun shots.  (Tr. at 65, 101, 104-05, 174-75, 207).  Agent Tolbert, the supervisor on the scene, testified he decided to enter the residence due to "the shots being fired and not knowing who was shot or what was going on, due to the exigent circumstances of what was taking place[,] I was concerned about the safety of the people that I was there with.  So we entered the door to encounter anybody that would have still been in the house while they[, i.e, the agents and officers at the rear of the residence,] were dealing with what was taking on from the back side of the house."  (Tr. at 123).

These facts, when considered in combination, establish that Agent Tolbert and TFO Henao reasonably believed that a person or persons, whether the remaining occupants of the residence, themselves, or the other agents and officers surrounding the residence, could be in danger.  Although most of the agents and officers on scene

31

believed the shots were fired from the outside of the rear of the residence, the agents and officers at the front door did not know any details of the shots, except that probably at least one of the three individuals believed to be in the residence was attempting to flee.  That individual, or one of the other occupants, may have fired the shots from just outside the back doors of the residence before retreating inside or from an open back window of the residence, thus, posing a threat to the law enforcement outside.  A law enforcement officer may have fired the shots at one of the occupants fleeing or at someone observed at a back door or window of the residence potentially injuring that individual.  The shots may have been fired because law enforcement at the rear observed an occupant with a firearm inside the residence or with access to the residence.  Of course, as was the case, the shots may have been totally unrelated to any threat from inside the residence and may not have posed any threat of harm to anyone inside or outside the residence.  However, the court does not believe that the agents and officers standing at the door were required to speculate or guess, under the totality of the circumstances known to them, as to the many possible reasons for the gun shots or to decide, because they did not know what happened, not to enter the residence while hoping that later events would prove inaction the best course of action.  The objective facts known to Agent Tolbert and TFO Henao need only lead to a reasonable belief

that someone is in danger inside the residence or from a threat from inside the

residence.  As the court in <u>Holloway</u> stated:

> Once presented with an emergency situation, the police must act quickly,
> based on hurried and incomplete information.  Their actions, therefore,
> should be evaluated "by reference to the circumstances then confronting
> the officer, including the need for a prompt assessment of sometimes
> ambiguous information concerning potentially serious consequences." .
> . .
>
> The fact that no victims are found, or that the information ultimately
> proves to be false or inaccurate, does not render the police action any less
> lawful. . . .   As long as the officers reasonably believe an emergency
> situation necessitates their warrantless search, whether through
> information provided by a 911 call or otherwise, such actions must be
> upheld as constitutional.

290 F.3d at 1339-40 (citations omitted); <u>see also</u> <u>Stuart</u>, 547 U.S. at 406, 126 S. Ct. at

1949 (Finding the officers' actions reasonable and rejecting claims that the conduct

observed by the officers, i.e., an altercation with blows being struck, was too minor to

justify the intrusion, the Court stated, "Nothing in the Fourth Amendment required

them to wait until another blow rendered someone 'unconscious' or 'semi-conscious'

or worse before entering.  The role of a peace officer includes preventing violence and

restoring order, not simply rendering first aid to casualties. . . ."); <u>United States v.</u>

<u>Maldonado</u>, 472 F.3d 388, 393 (5th Cir. 2006) (when reviewing the establishment of

exigent circumstances, "[i]f reasonable minds could differ, we do 'not second-guess

33

the judgment of experienced law enforcement officers concerning the risks of a particular situation'") (citation omitted).  Similarly, this court will not second guess the reasonable judgment of the experienced agents and officers at the scene given the potentially dangerous and rapidly developing situation at the residence.

For all of these reasons, the court finds that the Government established that the entry into the residence was based on a reasonable belief that the agents and officers faced an emergency.  Once inside the residence, the agents and officers lawfully conducted a protective sweep to determine if anyone inside the residence posed a threat to law enforcement or whether anyone was injured and required assistance.  Holloway, 290 F.3d at 1340 (because the officers entering the residence "had reasonable cause to believe they were entering a volatile and potentially dangerous situation . . ., officer safety" allowed for a detention of any individuals found therein and for a "limited search of the premises"); see also United States v. Caraballo, 595 F.3d 1214, 1224 (11th Cir. 2010) (officer lawfully on board ship based on exigent circumstances was authorized to conduct protective sweep where he "'possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene'") (quoting Maryland v. Buie, 494 U.S. 325, 334, 110 S. Ct. 1093, 1098, 108 L. Ed. 2d 276 (1990)); United States v. Martins, 413 F.3d

34

139, 150 (1st Cir. 2005) ("We hold . . . that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry.").  Any protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335-36, 110 S. Ct. at 1099.  Furthermore, evidence discovered in plain view during the protective sweep is properly admissible at trial.[25]  Holloway, 290 F.3d at 1340 (because officer's warrantless presence in the residence was justified by the exigent circumstances, he was authorized to seize evidence in plain view); United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995) ("The agents were free to seize any evidence they discovered in plain view within the proper scope of the protective sweep.").

The protective sweep of 215 Park Meadows Drive was properly limited, in both scope and duration, and during the protective sweep of the basement, in the back room,

---

[25]Evidence is in "plain view" if the agents are lawfully in the place where the object is seized and if the incriminating nature of the object seized is immediately apparent.  Horton v. California, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d 112 (1990).

AO 72A
(Rev.8/82)

TFO Otwell observed numerous items of evidence in plain view.  Agents Tolbert and Henning along with TFO Henao after entering the split level proceeded to quickly check the upstairs area of the residence by checking for any persons or bodies while the uniform officer remained on the landing inside the residence.  They only opened closed doors or moved any large pieces of furniture.  During the protective sweep, they did not find anyone or any contraband, such as, drugs, currency or weapons.  (Tr. at 65, 124-26, 172, 176-77, 207-09; May Tr. at 8, 29, 33, 46).

Just after the first four agents and officers, TFO Otwell entered the residence. He saw the uniformed officer standing on the landing and went downstairs to clear that part of the residence.  (Tr. at 65-66, 66, 102-05, 108).  When he reached the bottom of the stairs, TFO Otwell went to an open door towards the rear of the basement to see if anyone was inside.  (Tr. at 68; Gov't Ex. 33).  He observed that the door to the backyard was partially open and that there was another doorway at the rear of the room, which he walked to and looked inside.  This was a bathroom.  (Tr. at 68, 110-11).  He did not see anyone.  (Tr. at 68, 110).  However, as he walked through the room, he observed bags of white powder sitting on the floor, a kilo-press on a table, two handguns, a microwave and a hot plate with a container of boiling water and cinnamon sticks.  (Tr. at 68-71).  Along with the odor of cinnamon, he smelled the

odor of cocaine. (Tr. at 71). In the open basement door, he observed a set of keys, and in open cabinets and shelves, he observed chemicals, a heat sealer and bags, a scale and various other items associated with cutting and packaging cocaine. (Tr. at 72-75, 106-07). When he completed the sweep of that area, he was advised that the rest of the basement had been cleared, so he left the residence for the time being. (Tr. at 75-76). As Agent Tolbert stated when he entered the room, based on his experience, he knew immediately that the room was used to cut and repackage cocaine. (Tr. at 129-30). The items observed in the room were observed by law enforcement officers lawfully present, and their evidentiary value was immediately apparent.

For these reasons, the court finds that the items in the residence listed on Gov't Ex. 29 as drug evidence 3, 4, 5, 6, 7, 8, and 9, and as non-drug evidence 4, 5 (except for the firearm magazine discovered in the kitchen drawer), 7, 9, 13, 19, 21, and 25, are admissible having been observed in plain view during the lawful protective sweep of the residence. Accordingly, if Defendant has a legitimate expectation of privacy in the residence, the court recommends that his motion to suppress be granted in part and denied in part.[26]

---

[26]Items on Gov't Ex. 29 which are not admissible pursuant to this exception, and which the court understands the Government will not seek to introduce during its case-in-chief at trial if Defendant can challenge the search of the residence, are drug exhibits

### III.   Conclusion

For the foregoing reasons and cited authority, the court:

(1) **RECOMMENDS** that Defendant's motion [Doc. 23] to suppress evidence be **DENIED** as to the evidence seized from the residence and from the four vehicles located on the premises because Defendant does not have a legitimate expectation of privacy in either the residence or the vehicles and cannot bring a Fourth Amendment challenge to the searches; **or in the alternative**, if the District Court determines that Defendant, based on his arguments in his post-hearing brief, has a legitimate expectation of privacy in the residence,

(2) **RECOMMENDS** that Defendant's motion [Doc. 23] to dismiss be **GRANTED IN PART** and **DENIED IN PART** and that only the following items of evidence found in the residence, or in one or more of the four vehicles,[27] are admissible at trial as identified on Gov't Ex. 29, drug evidence 3, 4, 5, 6, 7, 8, and 9 and non-drug evidence 1, 2, 3, 4, 5 (excepting the firearm magazine found in the kitchen drawer), 6, 7, 9, 12, 13, 18, 19, 20, 21, 22, 23, 24 and 25; **and**

---

1 and 2 and non-drug exhibits 8, 10, 11, 14, 15, 16, and 17, along with the firearm magazine found in the kitchen drawer referenced in item 5.

[27]See Footnote 7.

(3) **RECOMMENDS** that Defendant's motion [Doc. 23] to suppress statements be **DENIED** as **MOOT**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO RECOMMENDED AND ORDERED** this 9th day of August, 2010.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

39